Christopher Winter (AK No. 0904007)
Telephone:  (503) 525.2725
Email:  chris@crag.org
Tanya Sanerib (OSB No. 025526)
Telephone:  (503) 525.2722
Email:  tanya@crag.org
*Pro Hac Vice* Application Pending
Crag Law Center
917 SW Oak Street
Suite 417
Portland, OR 97205
Facsimile:  (503) 296.5454

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| TONGASS CONSERVATION SOCIETY, GREENPEACE, and CASCADIA WILDLANDS, <br><br>       Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; FORREST COLE, in his official capacity as Tongass National Forest Supervisor; RUTH MONAHAN, in her official capacity as acting Alaska Regional Forester, <br><br>       Defendants. | Case No. <br><br> Complaint for Declaratory and Injunctive Relief <br><br><br> (Violations of National Environmental Policy Act, National Forest Management Act, and Administrative Procedure Act) |

      1.    Plaintiffs seek declaratory and injunctive relief for Defendants the United States

Forest Service, Forrest Cole, and Ruth Monahan's (collectively the "Forest Service") failure to

comply with the National Environmental Policy Act, 42 U.S.C. §§4321 *et seq.* (NEPA), the

National Forest Management Act, 16 U.S.C. §§1600 *et seq.* (NFMA), and the Administrative Procedure Act, 5 U.S.C. §§701 *et seq.* (APA) in developing and issuing the Record of Decision (ROD) for the Logjam Timber Sale (hereafter "Logjam project"). Located in the Tongass National Forest on Prince of Wales Island, the Logjam project area has been significantly impacted by past logging and the Logjam ROD authorizes the logging of 3,422 acres of the remaining predominately old growth forest in the project area. The ROD also authorizes the construction of five miles of permanent Forest Service roads and 17 miles of "temporary" roads, which will be added to the over 125 miles of road that already exist in the project area.

2. The project as approved by the Forest Service violates NFMA by failing to comply with the standards and guidelines in the 2008 Tongass Land and Resource Management Plan for the protection of Alexander Archipelago wolves and the requirements of NEPA that provide for public disclosure of relevant environmental information regarding the Alexander Archipelago wolf. In developing and approving the project, the Forest Service also failed to comply with NEPA's requirement that it take a "hard look" at potential impacts and the cumulative impacts to Sitka black-tailed deer, the main prey species of the wolf and disclose its analysis, methodology, and scientific support for its conclusions pertaining to Sitka black-tailed deer. The agency similarly failed to comply with the standards and guidelines in the 2008 Tongass Land and Resource Management Plan pertaining to Sitka black-tailed deer populations.

3. Additionally, the Forest Service also failed to take a "hard look" at the direct and indirect impacts to the streams and aquatic species such as salmon, as well as the cumulative impacts to aquatic habitat in light of the past, present, and reasonably foreseeable activities occurring in the area of the Logjam project. Nor has the Forest Service complied with the

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

requirements of the 2008 TLMP for maintaining roads, ensuring fish passage, and using best management practices when building and maintaining roads and culverts.

4.     Plaintiffs seek a declaratory judgment that the Logjam project as approved is contrary to law and arbitrary and capricious, and respectfully request that this Court set aside and remand the Logjam project to the Forest Service so that it may comply with applicable laws. They also seek injunctive relief prohibiting Defendants and its contractors, assigns and other agents from proceeding with the project and any timber sales created there under such as the Diesel Timber Sale, as well as an award of their attorneys' fees, expenses, and costs.

## JURISDICTION AND VENUE

5.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (injunctive relief), 2202 (declaratory relief), and 28 U.S.C. § 1346 (United States as a defendant).  This cause of action arises under the laws of the United States, including the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq*.; the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*.; and the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq.*

6.     An actual, justiciable controversy exists between Plaintiffs and Defendants. Plaintiffs have exhausted their administrative remedies, and the Forest Service's decisions denying Plaintiffs' administrative appeals constitute the final administrative decisions of the Forest Service regarding the Logjam project.  The relief requested by Plaintiffs is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).  The Logjam project and subsequent Diesel timber sale that are the subject of this dispute are located

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

in the Tongass National Forest in this judicial district and the Forest Service employees that approved the project are also located in this district. Plaintiffs all have offices in this judicial district. Venue is proper in Anchorage pursuant to Local Rule 3.3.

## PARTIES

8.      Plaintiff the Tongass Conservation Society is a non-profit public interest organization dedicated to conserving the biodiversity of the many island forests of the Tongass National Forest through protection of habitat from the pressures of industrial exploitation. The Tongass Conservation Society is based in Ketchikan, Alaska. Members of the public join the Tongass Conservation Society because of the organization's dedication to protecting the Tongass National Forest and the Alaskan environment. In addition to keeping its members informed about and engaged in on-going activities on public lands in southern Alaska, the Tongass Conservation Society also works with the Forest Service to combat the spread of invasive plants on public lands and hosts clean-up events for local roads and waterfront areas. The organization and its members participate in a host of public decision-making processes pertaining to the Tongass National Forest and conservation of the environment in southern Alaska. The Tongass Conservation Society brings this action on its own institutional behalf and on behalf of its members.

9.      Plaintiff Greenpeace, Inc. (Greenpeace) is a non-profit environmental organization incorporated in California and headquartered in Washington, D.C. with offices in Sitka, Anchorage, and San Francisco. Greenpeace's mission is to raise public awareness about environmental problems and promote changes that are essential to a green and peaceful future. There are approximately 250,000 current Greenpeace members in the United States and

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

Greenpeace brings this action on its own institutional behalf and on behalf of its members. Since the early 1990s, Greenpeace has worked to curtail the negative effects of logging and associated road building on ecosystems and the fish, wildlife, and subsistence users that depend upon them, as well as to protect the last remnants of old-growth forest in the United States and especially in the Tongass National Forest.

10.     Plaintiff Cascadia Wildlands is a non-profit public interest membership organization dedicated to protecting the ecosystems of the Cascadian bioregion –*i.e.*, the western temperate rainforests from California to Kodiak, Alaska – by educating, organizing, and agitating for a more compassionate and responsible relationship with these ecosystems. Cascadia Wildlands is headquartered in Eugene, Oregon and has an office in Cordova, Alaska. Cascadia Wildlands has had staff and/or board members working in Alaska continuously since 1998. Members of the public join Cascadia Wildlands because of the organization's success in defending wild places on public lands against unsustainable logging, road building, mining and other resource extraction activities. In particular, Cascadia Wildlands works to protect and restore old-growth forest ecosystems and large predators, including wolves. Cascadia Wildlands and its members and staff participate in government decision-making processes pertaining to public lands throughout the Cascadian bioregion. Cascadia Wildlands brings this action on its own institutional behalf and on behalf of its members.

11.     Members of the Plaintiff organizations use and enjoy the land managed by the Forest Service in the Tongass National Forest on Prince of Wales island, including in the northern portion of the Island where the Logjam project is slated to occur, for hiking, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational

*Tongass Conservation Soc'y v. Forest Service,*
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

activities. Plaintiffs' members derive recreational, inspirational, spiritual, scientific, educational, economic, and aesthetic benefit from their activities on public lands on Prince of Wales Island. Plaintiffs' members intend to continue to use and enjoy, and intend to continue to do so on an on-going basis in the future, areas of the Tongass National Forest on Prince of Wales Island, including places throughout or adjacent to the Logjam project area, such as the Logjam, Galligan and Hatchery Creek watersheds and other tributaries to Sweetwater Lake, Honker Divide, and the Sarkar Lakes area.

12. The aesthetic, recreational, scientific, educational, and spiritual interests of Plaintiffs' organizations, staff, and members will be adversely affected and irreparably injured if Defendants implement the Logjam project. These are actual, concrete injuries caused by the Defendants' failure to comply with mandatory duties under NEPA, NFMA, and the APA. The injuries would be redressed by the relief sought

13. Defendant the United States Forest Service is an agency within the United States Department of Agriculture entrusted with the management of our national forests.

14. Defendant Forrest Cole is the Forest Supervisor of the Tongass National Forest and he is sued in this official capacity. Mr. Cole signed the ROD authorizing the Logjam project. As Forest Supervisor, Mr. Cole has the responsibility to ensure that the Tongass National Forest is managed in accordance with applicable laws and regulations.

15. Defendant Ruth Monahan is the acting Regional Forester for the Alaska Region of the U.S. Forest Service and she is sued in this official capacity. The Regional Forester (then Mr. Dennis Bschor) was the Appeal Deciding Officer that denied Plaintiffs' administrative appeals of

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

the Logjam project.  Mrs. Monahan has the responsibility to ensure that national forests throughout Alaska are managed in accordance with applicable laws and regulations.

## STATUTORY FRAMEWORK AND FACTS GIVING RISE
## TO PLAINTIFFS' CLAIMS FOR RELIEF

**A.** **Summary of the Facts.**

    **1.** **The Logjam project.**

16.     The Logjam project is proposed for lands in the Tongass National Forest on Prince of Wales Island.

17.     The Tongass National Forest includes unique temperate old-growth rainforest habitat, islands, and both coastal and inland habitat.  The ecosystems of Prince of Wales Island provide habitat for both terrestrial and aquatic species alike.

18.     Prince of Wales Island supports Alexander Archipelago wolf and Sitka black-tailed deer populations and its streams and lakes provide habitat for both anadromous and resident fish species.  The island also supports local communities that depend upon wildlife and fish from the Tongass National Forest on Prince of Wales Island to provide part of their subsistence diet.

19.     On December 5, 2008, the Forest Service announced the availability of a Draft EIS for the Logjam project and a 45-day comment period.

20.     After the close of the public comment period on the Draft EIS for the project, the Forest Service increased the volume of timber being offered in certain units of the project under Alternative 5.  This change was made to offset the increased costs from road construction resulting from the need to use alternate rock sources for roads.  The need for alternate rock sources for road construction came about after the Forest Service's use of pyritic rock in road

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

construction resulted in significant water quality impacts and the need for Comprehensive Environmental Response, Compensation and Liability Act or Superfund clean-up actions on the Tongass National Forest along Coffman Cove road.

21.     On June 11, 2009, the Forest Service signed a Record of Decision for the Logjam project. On June 26, 2009, the Forest Service announced the availability of the Final EIS and Record of Decision for the Logjam project. The Forest Service selected a modified version of Alternative 5 from the alternatives discussed in the Final EIS.

22.     On July 31, 2009, Plaintiff Cascadia Wildlands appealed the decision approving the Logjam project and on August 10, 2009, Plaintiffs Greenpeace and Tongass Conservation Society appealed the same decision.

23.     On September 22, 2009, while the Logjam project appeals were under consideration by the Forest Service, the agency released information on the first sale to go forward under the Logjam project: the Diesel Timber Sale.

24.     Thereafter, on September 24, 2009, the Forest Service denied Plaintiffs' appeals of the Logjam project.

25.     The Logjam project area encompasses 56,133 acres of north Prince of Wales Island, of which 1,129 acres are state or private lands. The Project includes 3,422 acres slated for logging.

26.     Logjam will reduce productive old growth in the project area from 25,891 acres to 22,543 acres. The Project will also increase habitat fragmentation.

27.     Currently, somewhere between 125 and 151 miles of Forest Service roads exist in the Logjam project area.

*Tongass Conservation Soc'y v. Forest Service*,                                    Crag Law Center
Case No.                                                                      917 SW Oak St, Suite 417
                                                                                Portland, OR 97205

28.     The project will result in the construction of five additional permanent miles of Forest Service road.

29.     The project will also result in 17 miles of "temporary" roads.  While these road miles are delineated as "temporary," often the effects from such roads are long-lasting well beyond the life of the road.

30.     "Temporary" roads are often not temporary because of the expense of removing them.  For example, there is an estimated $47 million maintenance backlog for road work on the Tongass National Forest.

31.     The project includes most of wildlife analysis area 1421 and a small portion of area 1422.  It shares significant stretches of border with wildlife analysis areas 1319, 1420, 1422 and 1530.  Wildlife analysis areas are designated by the Alaska Department of Fish and Game (ADF&G).

32.     The current total road density in wildlife analysis area 1421 is 1.6 miles of road per square mile.

33.     Implementation of Alternative 5 would result in a total road density of 1.8 to 1.9 miles of road per square mile in the project area.

34.     In approving the Logjam project, the Forest Service recognized that not all the timber may be economical to offer.  The Forest Service also proposed issuing the first sale of approximately 30 million board feet of timber in fiscal year 2009 and that subsequent sales would be offered thereafter.

35.     On November 30, 2009, the Forest Service sent a letter to prospective bidders regarding the Diesel timber sale announcing that bids would be accepted on December 15, 2009

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

at 2:00 P.M. on an offering of 23.9 million board feet of timber, which is about one-third of the timber volume in the Logjam project decision.

36.     The Forest Service did not prepare a NEPA document to analyze the impacts of the Diesel timber sale on the environment.

37.     The Diesel timber sale area is 6,694 acres of which 1,164.5 acres will be logged. The units being offered for sale in Diesel are primarily on west facing slopes.

38.     The Sale will include the construction of 2.57 miles of permanent road and 11.66 miles of "temporary" road, which is about two-thirds of the road construction for the entire Logjam project, and the reconstruction of 2.70 miles of old road. Additionally, the sale provides for the storage of 2.57 miles of road as the post-haul road work.

39.     In order to make the Diesel timber sale economical, the Forest Service is permitting the bidder to ship to the lower 48 states or export abroad unprocessed Sitka spruce and western hemlock sawlogs. The volume of these exports or interstate shipments are permitted to reach fifty percent of the total sawlogs harvested as part of the Sale.

40.     The Diesel timber sale is slated to occur during normal operating seasons – *i.e.*, between April 1st and October 31st – and for no more than five seasons. However, all road construction must be completed by December 31, 2010. There is no deadline for the post-haul road work.

41.     On December 15, 2009, Viking Lumber Company was the only bidder on the Diesel Timber Sale.

*Tongass Conservation Soc'y v. Forest Service*,                                    Crag Law Center
Case No.                                                                                              917 SW Oak St, Suite 417
                                                                                                           Portland, OR 97205

### 2. The 2008 Tongass Land and Resource Management Plan.

42.     The 2008 Tongass Land and Resource Management Plan (2008 TLMP) is the land use plan governing the management of public lands in the Tongass National Forest.  The 2008 plan is a revision of the 1997 TLMP.

43.     As part of the 2008 TLMP, the Forest Service designated management indicator species (MIS).  These species are selected for emphasis in planning and are monitored by the agency because they represent other species that have similar habitat needs.

44.     The Alexander Archipelago wolf, the Sitka black-tailed deer, and pink and coho salmon are all management indicator species for the Tongass National Forest.

45.     The 2008 TLMP requires the Forest Service to implement a Forest-wide program to assist in maintaining long-term, sustainable populations of Alexander Archipelago wolves.

46.     In the event that wolf mortality concerns are identified, the 2008 TLMP requires the Forest Service to develop and implement a Wolf Habitat Management Program in conjunction with the ADF&G for the purpose of ensuring that the wolf mortality rate remains at a level that is sustainable for the wolf population.   Wolf Habitat Management Programs include management of road access because roads provide easy access for hunters or trappers that are in pursuit of wolves, as well as for those who are engaged in the unlawful hunting or trapping of wolves.

47.     The 2008 TLMP further provides that where road access and associated human-caused mortality have been determined, through an interagency analysis, to be a significant contributing factor to locally unsustainable wolf mortality, then both open and total road density

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

should be considered and total road densities of 0.7 to 1.0 mile per square mile or less may be necessary.

48.     These requirements were carried over from the 1997 TLMP although the requirement to consider total road densities was added to the Forest Plan in 2008.

49.     The Sitka black-tailed deer is a main food source for Alexander Archipelago wolves.  Thus, the Forest Service is also directed to where possible provide sufficient Sitka black-tailed deer habitat to maintain sustainable wolf populations and then to focus on meeting estimated human deer harvest demands.

50.     In doing so, the Forest Service must use the most recent version of the interagency deer habitat capability model and field validation of local deer habitat conditions to assess deer habitat, unless alternate analysis tools are developed.

51.     The Forest Service defines a model as an idealized representation of reality developed to describe, analyze, or understand it or a mathematical representation of the relationships under study.  The 2008 TLMP requires the Forest Service to develop interagency habitat capability models for any or all of the management indicator species.  Such models are to be periodically reviewed and updated to reflect the most current habitat relationships and habitat modeling technology.

52.     The Forest Service must also maintain or restore optimum water temperatures for salmonids.

53.     Streams in the Tongass are divided into classes.  Class I and Class II streams are those in which various fish species and/or their habitat are found.

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

54.     Pursuant to the 2008 TLMP the Forest Service must ensure that Class I and Class II streams that flow into Class I streams are at or between 50 and 68 degrees Fahrenheit during the summer or are at natural levels.

55.     The 2008 TLMP requires the Forest Service to utilize best management practices (BMPs) to control the effects of roads and culverts on water quality and fish habitat.

56.     BMPs for forest roads are particularly important because they operate as an exemption from the requirements of the Clean Water Act that dredge and fill activities – such as the construction of stream crossings – require a permit.  33 U.S.C. § 1344.  The Army Corps of Engineers, the agency charged with implementing the dredge and fill requirements of the Clean Water Act, created the exemption from the Act for forest roads that are constructed and maintained subject to BMPs developed by the Army Corps of Engineers.  33 C.F.R. § 323.4(a).  The Army Corps of Engineers' regulations provide that "[t]he design, construction and maintenance of the road crossing shall not disrupt the migration or other movement of those species of aquatic life inhabiting the water body."  33 C.F.R. § 323.4(a)(6)(vii).

57.     The Forest Service has incorporated the Army Corps of Engineers' BMPs into the Alaska Region's BMP Handbook (FSH 2509.22) in order to exempt road construction and maintenance from the dredge and fill permit requirements of the Clean Water Act.

58.     The use of BMPs for roads and culverts in the Tongass is designed to ensure compliance with the Clean Water Act pursuant to the Army Corps of Engineers' regulation.

### 3.     Alexander Archipelago Wolf.

59.     The Alexander Archipelago wolf is a subspecies of the gray wolf found in southeast Alaska on the mainland and on certain islands including Prince of Wales Island.

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

60.     The viability of this unique, endemic wolf subspecies has long been a significant concern of federal agencies and the public.

61.     In 1995 and again in 1997, the subspecies was considered for listing under the Endangered Species Act by the Fish and Wildlife Service (FWS).  60 Fed. Reg. 10056 (Feb. 15, 1995); 62 Fed. Reg. 46709 (Aug. 28, 1997).  In order to avoid the listing of the species under the Endangered Species Act, in 1997 the Forest Service included various requirements in the TLMP designed to provide protections for the wolf.

62.     Based on the 1997 TLMP and the species' ability to reproduce and disperse, the FWS concluded that listing of the subspecies was not warranted.

63.     Alexander Archipelago wolves are trapped and hunted in the Tongass National Forest pursuant to State regulation.

64.     Sitka black-tailed deer are the primary prey of the wolf.

65.     The greatest threats to the wolf are loss of habitat for Sitka black-tailed deer due primarily to logging, increases in wolf mortality following improved human access from roads, and continued high levels of human harvest of wolves.

66.     The Logjam project will both eliminate Sitka black-tailed deer habitat, including low elevation old-growth and mature winter habitat, and provide additional human access to wolves as a result of the road construction and reconstruction the project requires.

67.     In two e-mails he sent to the Logjam project biologist Marla Dillman in April of 2008, ADF&G biologist Dr. Person raised wolf mortality concerns that include the possible effects of the Logjam project.

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

68.     Forest Service employees working on the Logjam project were aware of these concerns while the Draft EIS was being prepared.

69.     The Draft EIS for the Logjam project did not disclose these concerns. Instead, Plaintiffs learned about these concerns as a result of a document in the planning record and Plaintiff Greenpeace obtained further information about these concerns in Freedom of Information Act requests the organization submitted to the Forest Service on January 12 and July 6, 2009.

70.     In a January 20, 2009, letter from the State of Alaska to the Forest Service regarding the Draft EIS for the Logjam project, the State explained, "[c]ontrary to what is stated in the DEIS (Ch.3, Issue 2, Page 92), wolf mortality is a concern by ADF&G and is tied directly to road densities. Road densities in Wildlife Analysis Areas (WAA) 1421 and 1422 are already high at 1.23 mi/mi² and 1.65 mi/mi² respectively."

71.     In their January 20, 2009 comments on the Logjam DEIS, Plaintiffs Greenpeace and the Tongass Conservation Society also raised wolf mortality concerns with the Logjam project. These concerns were raised again by these organizations in their appeal filed August 10, 2009.

72.     The Forest Service did not develop and implement a Wolf Habitat Management Program in conjunction with the Alaska Department of Fish and Game (ADF&G) for the purpose of ensuring that wolf mortality rates remain at a level that is sustainable for the wolf population in conjunction with preparing the Logjam project.

-Page 15 of 27-
*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

### 4. Sitka Black-Tailed Deer.

73.     Sitka black-tailed deer are an important part of the Prince of Wales ecosystem. They serve as prey for the Alexander Archipelago wolf and are a subsistence and game species for local communities. For these reasons, as well as their reliance on old growth forests during the winter, Sitka black-tailed deer are a management indicator species for the Forest Service.

74.     Deer use a variety of habitats throughout the year. During the winter, Sitka black-tailed deer depend upon low elevation mature and old-growth forests and especially those located on south facing slopes. The canopy cover from these forest types curtails snow accumulation on the ground, provides thermal cover for Sitka black-tailed deer, and supports availability of deer forage in winter snow. Due to the reliance of Sitka black-tailed deer upon old-growth habitat during the winter, lower elevation old-growth logging can significantly impact Sitka black-tailed deer populations.

75.     Sitka black-tailed deer typically have a home range of approximately 180 acres on Prince of Wales Island, which is reduced to about 100-125 acres during the winter.

76.     The Logjam project will impact local Sitka black-tailed deer populations particularly by reducing the quality and quantity of low elevation old-growth habitat, impairing the corridor between Sarkar Lake and Honker Divide, and impairing or removing other movement corridors.

77.     Traditionally, the Forest Service has run the deer habitat capability model to analyze the impacts of a land management decision on Sitka black-tailed deer in the Tongass National Forest.

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

78.     In assessing the impacts to deer from the Logjam project, the Forest Service did not run the deer habitat capability model specifically for the Logjam project.  Instead, the Forest Service tiered to the modeling results that were generated for the agency's analysis of the 2008 TLMP.

79.     One flaw with these modeling results is the Forest Service's failure to account for the impacts to deer occurring on private lands.  As a result of this flaw, the Forest Service under counted the on-going impacts to deer from loss of habitat and this flaw was carried through to the agency's modeling results.  The Forest Service did not accounted for the loss of deer habitat on Prince of Whales Island in non-federal ownership in assessing the impacts of the Logjam project.

80.     After tiering to the old modeling results, the Forest Service used a new methodology for assessing the impacts to deer.  The agency calculated some of the changes to deer habitat that would result from the Logjam project.  The Forest Service failed to explain in the Logjam draft EIS the new methodology it employed, whether that methodology was subject to peer review or any scientific approval, or the scientific authorities upon which it relied for assessing the impacts to Sitka black-tailed deer.  The public had no opportunity to comment on the this new method or its application before the Logjam decision was made.

81.     The Forest Service did disclose in the Final EIS that it focused on removal of high-value deer habitat, such as such as certain kinds of low elevation old growth.  This focus on high-value habitat fails to account for all the impacts to deer.  For example, Alternative 5 will result in the logging of 492 acres of high-value habitat in addition to the 2,930 acres of other kinds of deer habitat that will be logged but that was not accounted for by the Forest Service.

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

82. Nevertheless, the Forest Service concluded that the Logjam project would result in deer densities of about 16 deer per square mile in wildlife analysis area 1421, which is below the 2008 TLMP guideline of 18 deer per square mile.

83. The agency also concluded that the Logjam project may cause a significant restriction in the subsistence use of deer.

84. The Forest Service never adequately explained how it reached its conclusions regarding Sitka black-tailed deer.

85. Based on these failures, the Forest Service did not take a hard look at the potential impact to Sitka black-tailed deer populations.

### 5. The Aquatic Environment On Prince Of Wales Island.

86. Prince of Wales Island contains many streams and lakes that provide habitat for a variety of fish species including several species of salmonids and trout.

87. Local communities both on and near Prince of Wales Island depend heavily upon both salmon and non-salmon fishing opportunities for subsistence, as well as for commercial fishing opportunities.

88. The Logjam project area includes Barnes and Sweetwater lakes as well as Coffman, Galligan, Gold, Gutchi, Hatchery, Logjam, Naukati, Staney and Trumpeter creeks.

89. The Island has been heavily roaded and extensively logged. Numerous sources of sediment, including roads and areas that were previously logged, are impairing the health of aquatic species and their habitat.

90. For example, Hatchery Creek – a stream reach in the project area – has exceeded standards set for water quality under the Clean Water Act that are designed to protect fish and is

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

considered to be in a downward trend by the Forest Service due to sediment deposition and past timber harvesting.

91.     Many of the existing roads in the Logjam project area have failed or currently have failing drainage structures, on-going road erosion, and/or on-going ditch erosion.

92.     In approving the Logjam project, the Forest Service failed to take a hard look at the actual site-specific impacts to the aquatic environment from the combined effects of logging, road and landing construction, and existing conditions, especially in light of the lag time between the construction and reconstruction of roads and the decommissioning of roads and/or the repair of culverts.

93.     In purporting to address the cumulative effects to the aquatic environment in the area of the Logjam project, the Forest Service failed to analyze the combined impacts from other projects that were approved for the area under the Control Lake EIS, as well as from all other past, present, and reasonably foreseeable activities in the area.

94.     Additionally, the road network on Prince of Wales Island includes many stream crossings with culverts that often fail to provide passage for juvenile fish during a variety of different flow rates.  Such culverts are called "red culverts."

95.     The Logjam project area already includes 25 red culverts.

96.     These culverts fail to meet the requirements of the 2008 TLMP because they fail to provide fish passage.

97.     The Forest Service has not implemented the requisite BMPs for these culverts.

98.     The 25 red culverts in the Logjam project area are not exempt from the Clean Water Act.

*Tongass Conservation Soc'y v. Forest Service*,                    Crag Law Center
Case No.                                                          917 SW Oak St, Suite 417
                                                                 Portland, OR 97205

99.    Alternative 5 includes the addition of approximately 24 culverts, 15 of which will cross fish bearing streams.

100.    The Forest Service intends to remove culverts during road storage, which will occur after the project is complete.  The agency currently has an estimated $47 million backlog for road work on the Tongass National Forest and an estimated $20 million backlog for Prince of Whales Island.

101.    The Forest Service failed to take a hard look at the impacts to the aquatic environment from culverts.

102.    The Forest Service has failed to comply with the requirements of the 2008 TLMP for culverts.

B.    **Statutory and Regulatory Framework**

1.    **National Forest Management Act.**

103.    In 1976 Congress enacted the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600-1614, which governs the Forest Service's management of all national forests.

104.    NFMA establishes a two-step process for forest planning.  It first requires the Forest Service to develop, maintain, and revise Land and Resource Management Plans (LRMP) for each national forest.  16 U.S.C. § 1604(a).  The LRMP guides natural resource management activities forest-wide, setting standards, management area goals and objectives, and monitoring and evaluation requirements.

105.    Once an LRMP is in place, the Forest Service implements the plan through site-specific projects.  Each site-specific project must be consistent with the plan.  16 U.S.C. § 1604(i).

-Page 20 of 27-

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

106.    NFMA also imposes a duty on the Forest Service to preserve and enhance the diversity of plants and animals, consistent with overall multiple-use objectives for the Forest, as stated in the forest's plan.  16 U.S.C. § 1604(g)(3)(B).

## 2.    The National Environmental Policy Act.

107.    The National Environmental Policy Act (NEPA) is the nation's basic charter for the protection of the environment.  NEPA makes it national policy to "use all practicable means and measures . . .  to foster and promote the general welfare [and] to create and maintain conditions under which [humans] and nature can exist in productive harmony."  42 U.S.C. § 4331(a).  NEPA's purposes are to "help public officials make decisions that are based on [an] understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment."  40 C.F.R. § 1500.1(b)-(c).

108.    To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  This statement is commonly referred to as an Environmental Impact Statement (EIS).  NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  *Id.* § 4332(2)(E).

109.    An EIS must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) alternatives to the proposed action, (4) "the relationship between local short-term uses of [the] environment and the maintenance and enhancement of long-term

-Page 21 of 27-

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

productivity," and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented."  42 U.S.C. § 4332.

110.    The Council on Environmental Quality (CEQ) – an agency within the Executive Office of the President – has promulgated regulations implementing NEPA that are binding on all agencies.  *See* 40 C.F.R. §§ 1500-1508.

111.    The CEQ regulations provided that the direct, indirect, and cumulative effects of the proposed action must be analyzed under NEPA.  40 C.F.R. §§ 1508.8, 1508.27(b)(7).

112.    The CEQ regulations provide that, where the agency has not determined whether an EIS is required, it must generally prepare an Environmental Assessment (EA) to determine whether the environmental effects of its proposed action are "significant" and thereby require the preparation of an EIS.  40 C.F.R. § 1501.4(b).

113.    Whether the agency prepares an EIS or an EA, it must take a hard look at the impacts of the action and "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and the "information must be of high quality."  40 C.F.R. § 1500.1(b).

114.    In preparing NEPA documents, federal agencies "shall insure the professional integrity, including scientific integrity, of the discussions and analyses" and "identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions . . . ."  40 C.F.R. § 1502.24.

115.    NEPA's disclosure goals are two-fold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to ensure that the public has sufficient information to challenge the agency's action.

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim One –NFMA and NEPA Violations
### Pertaining to the Alexander Archipelago Wolf

116.    Plaintiffs incorporate by reference all preceding paragraphs.

117.    During the development of the Logjam project, wolf mortality concerns were raised to the Forest Service by both ADF&G and the public.  Despite these concerns, the Forest Service did not develop and implement a Wolf Habitat Management Program in conjunction with ADF&G for the area where the Logjam project is located as required by the 2008 TLMP. Additionally, the Diesel Timber Sale has been bid on and work can start on this project anytime on or after April 1, 2010 and a Wolf Habitat Management Program has not yet been put in place for the area.  The Forest Service has thus violated the plain language of the 2008 TLMP and the National Forest Management Act, 16 U.S.C. § 1604(i).

118.    In violating the requirements of NFMA, defendants have acted arbitrarily and capriciously, abused their discretion, and acted contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

119.    The Forest Service violated the CEQ's NEPA regulations by failing to acknowledge or publicly disclose ADF&G's wolf mortality concerns during the NEPA process, 40 C.F.R. § 1500.1(b).

120.    In violating the requirements of NEPA, defendants have acted arbitrarily and capriciously, abused their discretion, and acted contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

121.    These violations of law have caused, and will continue to cause, Plaintiffs' injuries as described in ¶¶ 8-12.

122.    Plaintiffs are entitled to an award of costs and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

### Claim Two – NEPA and NFMA Violations
### Pertaining to the Sitka Black Tailed Deer

123.    Plaintiffs incorporate by reference all preceding paragraphs.

124.    In approving the Logjam project without adequately disclosing its analysis of impacts to deer, explaining its methodology for assessing those impacts, or presenting the scientific research that supports its analysis, methodology and conclusions, the Forest Service violated the CEQ's NEPA regulations, 40 C.F.R. § 1502.24.

125.    The Forest Service failed to take a hard look at the impacts to Sitka black-tailed deer populations from the Logjam project.

126.    The Forest Service failed to adequately address the cumulative impacts to Sitka black-tailed deer from the Logjam project.

127.    In violating the requirements of NEPA, defendants have acted arbitrarily and capriciously, abused their discretion, and acted contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

128.    By failing to utilize the deer habitat capability model or a previously developed alternate tool and to ensure sufficient deer habitat to maintain sustainable wolf populations will remain, the Forest Service has violated the 2008 TLMP and the National Forest Management Act, 16 U.S.C. § 1604(i).

129.    In violating the requirements of NFMA, defendants have acted arbitrarily and capriciously, abused their discretion, and acted contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

130.    These violations of law have caused, and will continue to cause, plaintiffs' injuries as described in ¶¶ 8-12.

131.    Plaintiffs are entitled to an award of costs and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

**Claim Three –NEPA and NFMA Violations
Pertaining to the Aquatic Environment**

132.    Plaintiffs incorporate by reference all preceding paragraphs.

133.    In approving the Logjam project, the Forest Service failed to take a hard look at the actual impacts to the aquatic environment from the project in conjunction with existing conditions.

134.    By failing to adequately analyze the direct, indirect and cumulative impacts to the aquatic environment from the Logjam project along with other past, present, and reasonably foreseeable activities, the Forest Service violated NEPA.

135.    In violating the requirements of NEPA, defendants have acted arbitrarily and capriciously, abused their discretion, and acted contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

136.    In developing and approving the Logjam project and implementing it through the Diesel Timber Sale, the Forest Service failed to comply with the 2008 TLMP requirements that it: (1) use road closures, maintenance, and other measures to keep road-surface and road-side

erosion at low or near background levels; (2) ensure long-term fish passage; and (3) utilize BMPs to control effects of roads and culverts on water quality and fish habitat.

137.    In violating the requirements of NFMA, defendants have acted arbitrarily and capriciously, abused their discretion, and acted contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

138.    These violations of law have caused, and will continue to cause, plaintiffs' injuries as described in ¶¶ 8-12.

139.    Plaintiffs are entitled to an award of costs and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## PLAINTIFFS' PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court issue an order:

(1)    declaring that defendants have violated the National Environmental Policy Act, National Forest Management Act, and the Administrative Procedure Act;

(2)    holding unlawful and setting aside the Logjam project;

(3)    enjoining the implementation of the Logjam project and the Diesel Timber Sale or any parts thereof;

(4)    awarding Plaintiffs their costs and reasonable attorneys' fees; and

(5)    awarding Plaintiffs any other relief that the Court may deem just and proper.

Respectfully submitted,

_/s/Christopher Winter_____
Christopher Winter (AK No. 0904007)
Crag Law Center
917 SW Oak Street
Suite 417

-Page 26 of 27-

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205

Portland, OR 97205
Telephone:  (503) 525.2725
Facsimile:  (503) 296.5454
Email:  chris@crag.org

Dated:  January 11, 2010          Attorney for Plaintiffs

*Tongass Conservation Soc'y v. Forest Service*,
Case No.

Crag Law Center
917 SW Oak St, Suite 417
Portland, OR 97205