Tanya Sanerib (OSB No. 025526)
Telephone: (503) 525.2722
Email: tanya@crag.org
Christopher Winter (AK No. 0904007)
Telephone: (503) 525.2725
Email: chris@crag.org
Crag Law Center
917 SW Oak Street
Suite 417
Portland, OR 97205
Facsimile: (503) 296.5454

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| TONGASS CONSERVATION SOCIETY, GREENPEACE, and CASCADIA WILDLANDS,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; FORREST COLE, in his official capacity as Tongass National Forest Supervisor; RUTH MONAHAN, in her official capacity as acting Alaska Regional Forester,<br><br>　　　　Defendants, and<br><br>VIKING LUMBER COMPANY, INC.,<br><br>　　　　Defendant-Intervenor. | Case No. 3:10cv0006-TMB<br><br>**2D DECLARATION BY LARRY EDWARDS** |

I, Larry Edwards, hereby declare as follows:

1. I have lived in Sitka, Alaska for 33 years.

2. I have bachelor of science degrees in both aeronautical engineering and mechanical engineering.

3. I have spent significant amounts of time in Southeast Alaska's wild and intact forests. I enjoy the wildlife in these forests because they provide me with unparalleled outdoor experiences and natural resources, which I and many members of the community use to sustain ourselves and our families.

4. For over thirty years, I have educated myself on wildlife biology and the effects of land management practices like logging and road building by studying scientific papers relevant to the ecosystems of Southeast Alaska. I have interacted with the scientist authors and the managers of these lands to affirm and expand my understanding of wildlife biology.

5. I have explored the forests, rivers and waterways of Southeast Alaska by foot, kayak, and small boat. I have conducted fieldwork throughout Southeast Alaska for the Alaska Department of Fish & Game. I am retired from the department. My position with ADF&G was "Fish & Wildlife Technician." The focus of my work for ADF&G was in the aquatic realm. Through this work for ADF&G, I saw large areas of the Tongass National Forest both from the air and from the ground over many years. Through this work, I garnered an understanding of the landscape and the habitat that this landscape provides.

6. I am currently employed by Greenpeace, Inc. ("Greenpeace"). Greenpeace is a national non-profit corporation with Alaska offices in Anchorage and Sitka. Greenpeace is an independent campaigning organization that uses peaceful direct action and creative communication to expose global environmental problems and promote changes that are essential to a green and peaceful future. Greenpeace has worked to raise awareness about deforestation and the need to protect wildlife, especially those species that are dependent upon the remnant intact old-growth forests of the world and Greenpeace has worked to address past degradation and pursue alternatives that protect and restore these systems while providing for local human communities that depend on them.

7. I am a member of Cascadia Wildlands and the Tongass Conservation Society.

-Page 2 of 9-

*Tongass Conservation Soc'y v. Forest Service*,
Case No. 3:10-cv-00006-TMB

TCS v. Forest Service,
Case No. 3:10-cv-00006-TMB

Case 3:10-cv-00006-TMB    Document 186-2    Filed 10/04/10    Page 2 of 10

8. The Tongass National Forest is a place of unique ecological and social importance to the people of Southeast Alaska. Among other work here, Greenpeace works to protect old-growth forests, sustain populations of the region's endemic Alexander Archipelago wolf, to assure ample Sitka black-tailed deer populations to support the wolves and subsistence hunters who rely upon these forests, and to protect the clean water and wildlife these forests provide.

9. Greenpeace partners with local citizens, the Tongass Conservation Society and Cascadia Wildlands to make certain the agency incorporates scientific methods that ensure the ecological integrity of forest management decisions and their on-the-ground implementation. We consider the information provided by the agency, and communicate our ecological knowledge and scientific understandings back to the agency decision-makers. We go into the field to verify and assess agency projects. We work to ensure that Forest Plan standards and science and ecological integrity are adequately explained and taken into account.

10. I have been to Prince of Wales Island at least 15 times and I plan to go back in the near future. I know that local members and supporters of Greenpeace use these lands and intend to go back to these lands in the future.

11. I have visited the area in and around the Logjam Timber Sale Project (the "Logjam Project") on a number of occasions. I most recently visited the Logjam Project area in October of 2009. I enjoy the remnant stands of old-growth forests that are still found there. I enjoy hiking, viewing wildlife and fish in these forests. I intend to continue to visit and enjoy this area in the future. Greenpeace has members and supporters that use these lands and intend to go back in the future.

12. Old-growth forests are the product of the forest maturing slowly over centuries. These old forests play a pivotal role for flora and fauna which depend upon the unique characteristics of these old forests for their productivity and survival. When lost, remnant patches of old-growth in the Logjam area cannot be replaced or re-grown in our lifetimes, and the loss of this old-growth will be permanent for the people that use these areas for subsistence hunting and fishing. Old-growth forests are different than any other type of ecosystem.

13. The Logjam project will further degrade an ecosystem already degraded by past logging entries. Based on my review of the maps for the Logjam project it appears that many of the strips of trees that remain between the prior clearcuts will be removed completely or reduced

-Page 3 of 9-

*Tongass Conservation Soc'y v. Forest Service*,
Case No. 3:10-cv-00006-TMB

TCS v. Forest Service,
Case No. 3:10-cv-00006-TMB

Case 3:10-cv-00006-TMB    Document 186-2    Filed 10/04/10    Page 3 of 10
Exhibit 2 Page 3 of 10

significantly. I am very concerned that the remnant strips that will be left will not be effective to provide for wildlife.

14. Based both on my personal visits to the area and the project maps the Forest Service provided to the public, I have prepared demonstrative aerial images of the project area by adding Logjam Project logging unit boundaries to satellite photos that are publicly available through Google Earth. These maps are Exhibit 1 to my first declaration (DE 42-10) and demonstrate my personal knowledge of the area and to show the extent of the likely irreparable harm that will result if this project is allowed to proceed.

15. During my visits to the Logjam Project area, I observed evidence of wildlife. The proposed logging will remove important habitat for Sitka black-tailed deer and will negatively impact Alexander Archipelago wolves. One issue for me is that the Logjam project includes logging and road building in a critical wildlife corridor that links the Honker Divide and Sarkar Lake. I am concerned that this corridor will no longer serve its important function for deer, wolf and other wildlife populations, which currently rely on the corridor for dispersal, if that activity is allowed.

16. I am also concerned about the already high road density in the project area and the affected WAAs (wildlife analysis areas), the project's additional contribution to road density, and the essentially irreversible negative effect that the science tells me high road density can be expected to have on wolf mortality. Irreversible, negative consequences for the wolf population could be realized in either the short-term or in the future, depending on the variations in trapping and hunting pressure (illegal as well as legal) over time, either in the short term or at some time in the future. Once the roads are built, the access they provide even when decommissioned locks in that likelihood, long-term.

17. Per the substantive protections in the Tongass management plan, Alexander Archipelago wolves and Sitka black-tailed deer are designated "management indicator species," which are used as proxies to broadly gauge the health and functionality of the ecosystem, and this designation means the Forest Service must analyze and consider impacts on these species.

18. Greenpeace submitted comments to the Forest Service during the planning process, and Greenpeace filed an administrative appeal of the final decisions for the Logjam Project because the Forest Service in effect did not disclose or consider the impacts of this

-Page 4 of 9-
*Tongass Conservation Soc'y v. Forest Service*,
Case No. 3:10-cv-00006-TMB

TCS v. Forest Service,
Case No. 3:10-cv-00006-TMB

Case 3:10-cv-00006-TMB   Document 86-2   Filed 10/04/10   Page 4 of 10
Exhibit 2 Page 4 of 10

project on these management indicator species, even though it has tried to create the contrary appearance.

19. Exhibit 1 to my first declaration contains three-dimensional maps of the alternative that the Forest Service selected in the Record of Decision. These maps are fairly demonstrative and provide a reasonably accurate impression of the scope and extent of the character of the project and the harms that this project would cause, cumulative to past logging in the area. I prepared them as an aid in reviewing the FEIS and ROD, for our appeal.

20. Exhibit 1 contains 5 pairs of maps that show the extent of the logging in relation to past logging in the area. To produce these maps, I matched features on the three dimensional Google Earth image to features and unit boundaries on the Forest Service's flat (two dimensional) "Selected Alternative" and unit card maps (provided in the Record of Decision), and drew the unit boundaries on the three-dimensional Google Earth image. The three-dimensional terrain is shown at a 50% increase over the actual steepness to allow the viewer to better identify the habitat features.

21. Exhibit 1 at page 11 shows the orientation of the other maps. This is a copy of the flat "Selected Alternative" map in the Record of Decision on which I have substituted colors so that areas that have been logged in the past are evident instead of being very difficult to discern, to assist me in making the three-dimensional maps.

22. Exhibit 1 to this declaration contains Maps 1a and 1b on pages 1 and 2. These maps provide an overview of the whole Logjam project area, except that a few units to the northeast of Sweetwater Lake are under cloud cover and do not appear. Map 1a shows the extent of the natural and pre-Logjam project human-caused fragmentation of productive old-growth habitat in the planning area. Based on my personal observations, the remaining better quality old-growth forest habitat is scattered among muskegs, areas of lower quality forest, and prior clearcuts. This current condition exhibits greatly reduced habitat quality because the extensive past logging has selected many of what were the best patches of forest. Map 1a shows that habitat connectivity has been greatly reduced by previous logging, and Map 1b shows it will be further affected adversely by the Logjam project. Honker Divide, which is an old-growth habitat reserve, arcs in a band from approximately a lake near the center of the image, along a string of lakes to near the upper right hand corner, encompassing land that is undeveloped except for the

-Page 5 of 9-
*Tongass Conservation Soc'y v. Forest Service*,
Case No. 3:10-cv-00006-TMB

TCS v. Forest Service,
Case No. 3:10-cv-00006-TMB

Case 3:10-cv-00006-TMB    Document 186-2    Filed 10/04/10    Page 5 of 10
Exhibit 2 Page 5 of 10

string of clearcuts near the upper right hand corner. Diagonally off-screen to the lower left is the Sarkar Lakes old-growth habitat reserve. The maps show that the Logjam project will log the connectivity corridor between the two reserves, and (as all the other maps also show) that it will add to the cumulative loss of old-growth habitat generally.

23. Maps 2a and 2b show most of the especially critical connectivity area that is west and southwestward of Sweetwater Lake, which appears to be the smallest link in the connection between the Honker Divide and Sarkar Lakes old-growth habitat reserves. The view is northwestward from near the center of the project area. Logjam Creek runs left to the right, across the middle of the maps. The map shows how the Logjam project will narrow and, in certain cases, eliminate broad leave strips that were left after prior logging. I am concerned that this will greatly impair connectivity and may functionally block it.

24. Maps 3a and 3b show units roughly in the center of the Logjam project area, and Maps 4a and 4b are a zoomed view of part of that image. Logjam Creek runs from right center to lower left of the former pair, and some of these units on both sides of the creek are also shown on Map 2b. The maps show that the project threatens to significantly reduce the connectivity of the forest over a large area of land that is important to connectivity at the landscape scale.

25. Maps 5a and 5b show most of the eastern side of the Logjam project area. A cloud layer is at the lower edge of the image, and more eastside units are behind the view point, under clouds. Like the other maps, these show a systematic elimination of habitat and high cumulative impact.

26. To help demonstrate the potential harm from this project to wolves, I am citing to a presentation from the 2006 Tongass Conservation Strategy Review Workshop given by Dr. Dave Person. Dr. Person is an ADF&G expert on the wolves found on Prince of Wales Island. I personally video taped the presentation, and have attached notes I took from studying that video tape as Exhibit 2 to my first declaration (DE 42-10). (In 2006 I submitted a tape of Dr. Person's presentation to Randy Fairbanks, of Forest Service contractor Tetra Tech and the leadman for preparation of the 2008 Forest Plan, and asked him to include the tape in the Forest Plan planning record – but the tape is absent from the record.) This information underscores the likely irreparable harm that this project will cause to the region's wildlife. Dr. Person's powerpoint is also in the record for the 2008 TLMP revisions (603_0994).

-Page 6 of 9-
*Tongass Conservation Soc'y v. Forest Service*,
Case No. 3:10-cv-00006-TMB

TCS v. Forest Service,
Case No. 3:10-cv-00006-TMB

Case 3:10-cv-00006-TMB    Document 186-2    Filed 10/04/10    Page 6 of 10
Exhibit 2 Page 6 of 10

27.     The Forest Service's analysis of cumulative impacts to deer carrying capacity has a fatal flaw that is at first hard to envision, but is really quite simple to understand if one can get beyond an intuitive barrier. The intuitive barrier is the notion that because the Forest Service's analysis assumes zero winter carrying capacity for deer on the non-federal lands, those lands can simply be disregarded in all respects when calculating that capacity. I have prepared the charts in Exhibit 3 attached to this declaration to help explain why that intuition is wrong, because words alone have proven insufficient.

28.     Exhibit 3's charts are for a hypothetical WAA (wildlife analysis area). The Forest Service estimates deer carrying capacity on the basis of WAAs because: they are roughly the size of a wolf pack home range; an adequate supply of deer (the primary prey) must exist within each home range; and data exists that can be used with the deer model to determine the capacity of each WAA Tongass-wide. For the 2008 Forest Plan the deer model was used to make historic and current carrying capacity estimates for all WAAs on the Tongass NF, and the Logjam EIS relied on those estimates. This is why my charts are based on the scale of a WAA.

29.     Exhibit 3's Figures 1 and 2 depict two ways of estimating the deer carrying capacity of the hypothetical WAA, and the respective pie slices are identical in both figures. Regardless of what carrying capacity the deer model may have estimated for the non-federal lands, the capacity has been downgraded to zero, in accordance with the Forest Service's conservative (and wise) assumption that these lands do not (or will not in the future) provide winter habitat for deer. The "Correct Analysis" (Fig. 1) averages the federal land's carrying capacity over the total land area within the WAA, irrespective of land ownership. Even though non-federal lands are assumed to have zero capacity, their land area is included in the calculation of the WAA's overall habitat capacity. Although the federal portion of the WAA has a carrying capacity of 20 deer per square mile, the average for the whole WAA is only 12 deer per square mile ($20 \times 60 / 100 = 12$) when the non-federal land mass is included. That result is significant, because it is less than the 18 deer per square mile specified in the TLMP standard and guideline.

30.     The "2008 TLMP Analysis Method" in Fig. 2 makes the same fatal mistake as do the Logjam FEIS and TLMP FEISs. Here, the non-federal lands are once again assumed to provide zero deer habitat but then are entirely disregarded, as if they are not part of the WAA

-Page 7 of 9-
*Tongass Conservation Soc'y v. Forest Service*,
Case No. 3:10-cv-00006-TMB

TCS v. Forest Service,
Case No. 3:10-cv-00006-TMB

Case 3:10-cv-00006-TMB    Document 186-2    Filed 10/04/10    Page 7 of 10
Exhibit 2 Page 7 of 10

and do not exist.  The Forest Service disregards these lands simply because they are assumed to have no carrying capacity.  As a result, the carrying capacity of the federal lands is averaged only over the federal land mass and not the combined federal and non-federal lands that comprise the WAA.  The arithmetic is: 20 x 60 / 60 = 20.  Accordingly, the 20 deer per square mile capacity of the federal portion is reported as the capacity of the entire WAA, instead of the correct 12 deer per square mile.  This exposes a gross conceptual mistake in the Forest Service's analysis.  The agency's intended conservative assumption of non-federal lands providing zero carrying capacity is not implemented, and instead all actual contributions of logging on non-federal lands to cumulative impacts in the WAA are completely overlooked.  The carrying capacity of the WAA is overestimated, and impacts are underestimated.

31.  I believe this gross error is crucial for Prince of Wales Island (POW) wolves and deer hunters.  A significant portion of the island is non-federal land that has been and continues to be heavily logged, and the above error has caused impacts on those lands to be ignored when estimating the current and future deer capacities of Logjam and POW WAAs.  Because much of POW is interconnected by roads, loss of carrying capacity in a place like the Logjam area will displace hunters from there to other parts of the island, where competition will increase.  Moreover, the same analysis error in the Forest Plan FEIS has caused the carrying capacity in those other parts of the island to be overestimated too, and cumulative impacts there to be underestimated.   As a result, after a series of hard winters the situation for wolves, deer and deer hunters throughout POW is likely to be far worse than the Forest Plan and Logjam EISs have imagined.  Loss of deer winter habitat from the Logjam project has detriments that neither the Logjam EIS nor the Forest Plan EIS have considered, and the cumulative impacts involve not just Logjam but the whole roaded portion of the island and both the federal and non-federal lands in those WAAs.  In these regards, the Logjam project must be viewed in the context of which it is an integral part -- the inter-connected, roaded portion of Prince of Wales Island, if not the whole island.

32.  On January 14, 2010, I learned that the Diesel Timber Sale contract was awarded to Viking Lumber Company.  I understand that Viking was the only company that bid on the contract for the Diesel Timber Sale.

-Page 8 of 9-
*Tongass Conservation Soc'y v. Forest Service*,
Case No. 3:10-cv-00006-TMB

TCS v. Forest Service,
Case No. 3:10-cv-00006-TMB

Case 3:10-cv-00006-TMB   Document 186-2   Filed 10/04/10   Page 8 of 10
Exhibit 2 Page 8 of 10

33. I have reviewed the information the Forest Service provided bidders and the public on the Diesel Timber Sale. Based on my experience with these issues, I expect a significant portion of the logs from that sale may be exported out of Alaska before they are milled.

34. The Forest Service's notice of the Diesel sale misled the public that logging would only occur during the normal operating season, from April 1 through October 31. Without notifying the public, the Forest Service changed course and began to implement the project early. The early implementation of the project harms Greenpeace's organizational interests and the interests of its members and supporters that live, work and raise families in the area.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 15th day of July, 2010,

*Larry Edwards*

-Page 9 of 9-
*Tongass Conservation Soc'y v. Forest Service,*
Case No. 3:10-cv-00006-TMB

TCS v. Forest Service,
Case No. 3:10-cv-00006-TMB

Case 3:10-cv-00006-TMB   Document 18-2   Filed 10/04/10   Page 9 of 10

**Figure 1**



**Figure 2**



TCS v. Forest Service,
Case No. 3:10-cv-00006-TMB

Case 3:10-cv-00006-TMB   Document 186-2   Filed 10/04/10   Page 10 of 10

Exhibit 2 Page 10 of Exhibit 5 to Edwards Decl. (Ex 5)